IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANDREA SESSOMS, | : | |
|     *Plaintiff*, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| THE TRUSTEES of the UNIV. of PA., | : | |
| d/b/a THE UNIV. of PA. HEALTH SYS., | : | No. 16-2954 |
|     *Defendant*. | : | |

## MEMORANDUM

PRATTER, J.                                                                                                                  MAY 24, 2017

Plaintiff Andrea Sessoms brings this employment discrimination suit against her former employer, the Trustees of the University of Pennsylvania ("Penn"), under Title VII, the Americans with Disabilities Act, and the Rehabilitation Act. Penn has moved for summary judgment, arguing that Ms. Sessoms's claims all fail as a matter of law. The Court heard oral argument on May 4, 2017 and will grant Penn's motion in its entirety.

### BACKGROUND

Ms. Sessoms, an African American female, complains of sexual harassment, disability discrimination, failure to accommodate, racial discrimination, and retaliation in connection with her employment as a Human Resources Information Systems Coordinator at the University of Pennsylvania Health System. At the time Ms. Sessoms began working in Human Resources for the Penn, there was only one other HRIS Coordinator in her department, a Hispanic male. In 2014, the department was reorganized, and Maria Colavita (a white female) became the new manager of the HRIS Coordinator team. Her supervisor was Margaret Alford (a white female). Another white female was also hired as an HRIS Coordinator in 2014.

1

In early 2014, Ms. Sessoms received a performance review, on which she scored between a 2 (threshold) and a 3 (target). Ms. Colavita characterized Ms. Sessoms's performance as inconsistent, but also testified at a deposition that Ms. Sessoms's performance was, at that particular point in time, satisfactory. In April 2014, at the same time that Ms. Sessoms's mother suddenly fell seriously ill, Ms. Sessoms's work performance began to decline. Ms. Sessoms's mother passed away in May 2014, and Ms. Sessoms took two weeks of leave. Ms. Sessoms returned to work; her performance continued to decline. Ms. Sessoms argues that Penn offers no proof of this decline in work performance beyond the testimony of Ms. Colavita, but admitted that because of her grief over her mother's death and memory problems, she may have made errors.

After Ms. Colavita became her supervisor, Ms. Sessoms claims that she was overlooked at meetings and verbally abused, unlike her non-black, non-disabled co-workers. Ms. Sessoms also claims that Ms. Colavita harassed her in a different way by touching Ms. Sessoms's inner thigh during a one-on-one meeting in September 2014, while discussing an incident in the past between Ms. Colavita and a male supervisor. Ms. Sessoms complained about Ms. Colavita's treatment of her to Ms. Alford and to others on multiple occasions, to no avail.

On September 12, 2014, Ms. Sessoms received a written coaching memo due to her poor performance, pursuant to the department's policies. Ms. Sessoms claims that the coaching was written by Ms. Colavita, but signed by Ms. Alford. The written coaching was presented to Ms. Sessoms at a meeting attended by her, Ms. Colavita, and Ms. Alford. Ms. Sessoms claims that during that meeting, Ms. Colavita made a derogatory comment about her disability – namely, that Ms. Colavita said that her medical problems did not matter. On that same date, Ms. Sessoms requested leave pursuant to the FMLA because of acute stress disorder, major depressive

disorder, and memory issues. The request was approved. While on leave, Ms. Sessoms filed a charge of discrimination with the EEOC. After she had exhausted her FMLA leave, Ms. Sessoms was permitted to take 12 more weeks of medical leave, pursuant to Penn's employment policies.

On March 4, 2015, after her expiration of 24 weeks of leave, Penn reached out to Ms. Sessoms to invite her to submit a Certificate of Return to Work and/or an Employee Request for Reasonable Accommodation. On March 16, 2015, Ms. Sessoms submitted these forms, on which she indicated that she could not return to work without restrictions. The parties then met to discuss possible accommodations on April 13, 2015. Ms. Sessoms requested four items: (1) a part-time schedule, (2) time upon returning to work to become reacquainted with procedures, (3) ergonomic review of workspace,[1] and (4) transfer to a supervisor other than Ms. Colavita. Penn offered all of the accommodations except for reassignment to a new a supervisor.[2] Although she may have initially accepted the offer or in some way indicated that acceptance was likely, Ms. Sessoms eventually rejected the offered accommodations, claiming that accepting them would be against medical advice. Ms. Sessoms notes that she could have worked for another analyst or senior coordinator, or in another department, but that none of those options were offered to her. She does not, however, identify any other open positions for which she was qualified. On April 22, 2015, Ms. Sessoms was terminated. According to Penn, the termination was solely due to Ms. Sessoms's refusal to return to work with reasonable accommodations. Ms. Sessoms was eventually replaced with an African-American female with a disability.

---

[1] Ms. Sessoms argues that she did not ask for this, but it is included in the documentation and, in any event, Penn agreed to that accommodation.

[2] There is some dispute over whether the part-time hours ultimately offered to Ms. Sessoms were the ones she wanted – she now claims that 10 a.m. to 2 p.m. were the only hours offered, and that these hours were the busiest time of the day and thus not appropriate for her.

Ms. Sessoms filed this suit in June, 2016, seeking damages for failure to accommodate her disability; racial, gender, and disability discrimination; and retaliation. After the completion of discovery, Penn filed the pending motion for summary judgment, seeking dismissal of all of Ms. Sessoms's claims.

**LEGAL STANDARD**

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks,* 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson,* 477 U.S. at 248). Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. *See Anderson,* 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.,* 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a

genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

**DISCUSSION**

    A. <u>Failure to Accommodate claim</u>

First, Penn argues that Ms. Sessoms has not shown that it failed to make reasonable accommodations to enable her to return to work, in that the only accommodation it rejected was her request for a different supervisor. "Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 306 (3d Cir. 1999). For an employer "to be found liable for discrimination on the basis of failure to accommodate, the plaintiff must prove '(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [s]he has suffered an otherwise adverse employment decision as a result of discrimination . . . [which] in this context include[s] refusing to make reasonable accommodations for a plaintiff's disabilities.'" *Hohider v. United Parcel Service, Inc.,* 574 F.3d 169, 186–87 (3d Cir. 2009) (quoting *Williams v. Phila. Housing Auth. Police,* 380 F.3d 751, 761 (3d Cir. 1999)) (internal quotations omitted).

Penn argues that Ms. Sessoms's request for a new supervisor was not reasonable as a matter of law, citing EEOC enforcement guidelines and case law. *See Taylor*, 184 F.3d at 319 n.10 ("a disabled employee is not entitled to a supervisor ideally suited to his or her needs"); *Gaul v. Lucent Tech., Inc.*, 134 F.3d 576 (3d Cir. 1998) (request to be transferred away from co-worker causing employee stress was not reasonable); *Dart v. Cty. Of Lebanon*, No. 13-CV-02930, 2014 WL 4792135, at *10 (M.D. Pa. Sept. 23, 2014) (finding a request for a different supervisor unreasonable as a matter of law); Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, Question 33 (EEOC Notice No. 915.002, Oct. 17, 2002) ("An employer does not have to provide an employee with a new supervisor as a reasonable accommodation.").

Penn also argues that because Ms. Sessoms was the one who rejected the reasonable accommodations and insisted upon an unreasonable one, she was at fault for the breakdown in the interactive process and therefore cannot now complain that Penn was at fault. *Yovtcheva v. City of Philadelphia Water Dep't*, 518 Fed. App'x. 116, 121 (3d Cir. 2013) ("An individual with a disability is not required to accept an accommodation, aid, service, opportunity or benefit which such qualified individual chooses not to accept. . . However, if such individual rejects a reasonable accommodation . . . that is necessary to enable the individual to perform the essential functions of the position held or desired, and cannot, as a result of that rejection, perform the essential functions of the position, the individual will not be considered qualified.").

Ms. Sessoms responds by arguing that the failure to accommodate started in the months leading to September 2014, in that she reported health concerns as well as harassment by Ms. Colavita during that time and no one offered any accommodations to assist her. She argues that her employer was aware of her medical condition and of her requests for help (complaining

about Ms. Colavita and complaining about memory problems), which triggered Penn's duty to enter into an interactive process. She also argues that she did not necessarily want to stay in her old job with a different supervisor, but that she was open to any job working for someone other than Ms. Colavita, and that Penn did not give her any such options. She contends that she did not have enough time to find other open positions with Penn on her own. She argues that she had a problem with the part-time hours proposed by Penn as well, but even different part time hours would not have addressed her concern about working for Ms. Colavita.[3]

Penn replies that Ms. Sessoms has not pointed to any evidence that she requested an accommodation prior to September 2014. It also denies that Ms. Sessoms ever requested a different job, or that Penn in any way prevented her from looking at the publicly available job listings on its website and applying for any of them. Moreover, Penn argues that Ms. Sessoms has the obligation at this stage to identify open positions for which she was qualified, and that she has not done so. *See Castellani v. Bucks Cnty. Municipality*, 351 Fed. App'x. 774, 777 (3d Cir. 2009) ("If the employee cannot be reasonably accommodated in her previous position, she must identify another position that is vacant and funded, at or below her level, for which she is qualified to perform the essential functions. . . if, after an opportunity for discovery, the employee still has not identified a position into which she could have transferred, the court must grant summary judgment in favor of the defendant.") (internal citations omitted); *Donahue v. Consolidated Rail Corp.*, 224 F.3d 226, 234 (3d Cir. 2000) ("[I]n a failure-to-transfer case, if, after a full opportunity for discovery, the summary judgment record is insufficient to establish

---

[3] Ms. Sessoms also points to internal documents that show that Penn's counsel may have advised the decision-makers to offer Ms. Sessoms the opportunity to find a new position somewhere else at Penn. She claims the fact that the decision-makers did not offer her any other jobs, against advice of counsel, is proof that Penn acted in bad faith during the interactive process. Penn, naturally, argues that it does not matter what counsel recommended. Ultimately, though, because Ms. Sessoms has not shown any evidence or even made the suggestion that there were open positions that she was qualified to perform, it does not matter whether Penn offered her another job.

7

the existence of an appropriate position into which the plaintiff could have been transferred, summary judgment must be granted in favor of the defendant—even if it also appears that the defendant failed to engage in good faith in the interactive process.").

Regardless of who acted in what manner during the interactive process, it is clear that there were no accommodations that Penn could have offered that would have made Ms. Sessoms accept her prior position with Ms. Colavita as a supervisor. To the extent that Ms. Sessoms argues that she requested a new job within Penn and that she was not afforded enough time to identify a new job, she has not provided any evidence that there *were* any open jobs that she would have been qualified to perform. Again, then, it does not much matter whether Penn gave her enough time or assistance in identifying a new job if Ms. Sessoms has no evidence there were available jobs. As for the claim that Penn failed to provide any accommodations before September 2014, even giving Ms. Sessoms the benefit of the doubt that her complaints amounted to a request for an accommodation, the complaints revolved around Ms. Colavita. Thus, the analysis of this earlier "request for accommodation" is the same as her later request – an employer has no obligation to provide a different supervisor for an employee in their current position as a reasonable accommodation, and an employee must at least show that there was an open position to which she could have transferred if transfer to a new job with a different supervisor was the reasonable accommodation she sought. Therefore, the Court will dismiss Ms. Sessoms's reasonable accommodation claims.

### B. Racial Discrimination, Disability Discrimination, and Retaliation Claims

When evaluating discrimination and retaliation claims under Title VII and the ADA, courts apply the familiar three-part burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, a plaintiff must first establish

a *prima facie* case for discrimination. *Id.* at 802. If a plaintiff does so, the burden then shifts to the defendant to advance a legitimate, non-discriminatory reason for its actions. *Id.* at 802–03. If the employer does so, it is up to the employee to "point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Lawrence v. Nat'l Westminster Bank N.J.*, 98 F.3d 61, 66 (3d Cir. 1996). The *McDonnell Douglas* framework "was never intended to be rigid, mechanized or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990).

To establish a *prima facie* case of disparate treatment based on race or disability, a plaintiff must show (1) that she was a member of a protected class; (2) that she was qualified for the position; (3) that she suffered an adverse employment action; and (4) circumstances give rise to an inference of unlawful discrimination. *See, e.g.*, *Walton v. Mental Health Ass'n. of Southeastern Pa.*, 168 F.3d 661, 668 (3d Cir. 1999) (burden shifting rules that apply to Title VII claims also apply to ADA claims). To the extent that Ms. Sessoms asserts a claim for disparate treatment (as opposed to hostile work environment, which will be discussed below), the only adverse employment action she has identified is her termination. As to her race and disability discrimination claims, Penn argues that there are no circumstances giving rise to an inference of discrimination with respect to her termination. It points out that her replacement was also African-American and disabled, and that there are no similarly situated individuals (*i.e.*, employees who took an extended leave of absence and then refused to return to work without a different supervisor) who were treated differently.

9

Ms. Sessoms's primary argument that her employment was terminated due to her race and/or disability is that she was the only African-American employee in her department, as well as the only disabled employee in her department. She also points to one comment made by Ms. Colavita in a September, 2014 meeting, which she claims was a derogatory comment regarding her disability. However, these facts alone are not sufficient to raise an inference of discrimination in the decision to terminate Ms. Sessoms's employment. Ms. Sessoms has not identified any similarly situated individuals, nor does she offer evidence that would raise her claim that race or disability motivated her termination beyond speculation. Therefore, without any evidence connecting her race or her disability to the decision to terminate her employment, Ms. Sessoms's disparate treatment claims must fail.

As to the retaliation claim, Penn observes that several months passed between the filing of an EEOC charge and her termination of employment, and that there was no pattern of antagonism or hostile treatment between the EEOC charge and the termination. *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007) ("Where the time between the protected activity and adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee.") Indeed, Ms. Sessoms was not even at work for that time period. Penn also argues that even if the *prima facie* case is met with respect to her retaliation claim, it had a legitimate, non-discriminatory reason for terminating her employment (*i.e.*, that Ms. Sessoms would not return to work without a different supervisor) and there is no evidence to show that this legitimate, non-discriminatory reason was mere pretext, in that (1) there are no comparators, (2) Ms. Sessoms was replaced by someone

who was a member of all of her protected classes, and (3) Penn offered all reasonable accommodations.

Ms. Sessoms counters that Penn failed to properly engage in the interactive process by pre-determining which accommodations it would offer and refusing to even consider her request for a job with a supervisor who did not harass her. This failure, she argues, is evidence that the true reason for her termination was retaliation. Ms. Sessoms also points to her complaints to other supervisors about Ms. Colavita's conduct and her testimony that Ms. Colavita's harassment increased thereafter as providing evidence of a "pattern of antagonism" in support of her retaliation claim. As discussed above, however, Ms. Sessoms's reasonable accommodation claim fails because assigning a different supervisor would not have been a reasonable accommodation, and she has not provided any evidence that there were other jobs with a different supervisor to which she could have transferred. Thus, to the extent that she is basing her retaliation claim on the alleged failure to provide a reasonable accommodation, the retaliation claim must fail. Put another way, even if her complaints qualified as protected conduct, Penn has offered a legitimate, non-discriminatory reason for Ms. Sessoms's termination (*i.e.*, that Ms. Sessoms would not agree to return to work without a new supervisor, giving Penn no choice but to terminate her employment), and Ms. Sessoms has failed to show that this reason was pretextual.

  C. <u>Hostile Work Environment</u>

To establish a *prima facie* hostile work environment claim under Title VII or the ADA, a plaintiff must show:

> 1) the employee suffered intentional discrimination because of his/her sex[, race, or disability], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a

11

reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability.

*Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). Factors to consider in determining whether a hostile work environment actually exists include, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993).

Ms. Sessoms potentially advances four hostile work environment claims – race, gender, disability, and retaliation. Beginning with her gender-based claim, Ms. Sessoms alleges only one incident that she claims was related to her gender – the incident in early September, 2014, when Ms. Colavita touched her inner thigh. Penn argues that even if this one incident of sexual harassment actually happened, one incident is not sufficient to rise to the level of a hostile work environment, in that there is nothing severe or pervasive about it. Ms. Sessoms agrees that her gender-based hostile work environment claim is based only on this one incident, but argues that even though one incident may not be sufficient to support a gender-based hostile work environment claim, the incident can still be counted toward the other hostile work environment claims. Because Penn is correct that this one incident is not sufficiently severe to create a hostile work environment on its own (and because Ms. Sessoms all but concedes that point), the Court will dismiss the gender-based hostile work environment claim.

As to race, disability, and retaliation, Ms. Sessoms argues that her supervisors' treatment of her did rise to the level of severe and pervasive, as she was constantly criticized, ignored, and publicly berated. The evidence Ms. Sessoms presents to support each of these claims is the same and is based on her own deposition and a document that she prepared while employed by Penn, in which she kept notes on what she perceived to be unfair treatment. It is difficult to tell from

this evidence how frequently some of this offending treatment supposedly occurred. While she characterizes the harassment as very frequent in her deposition testimony, the notes she kept contemporaneously tell a somewhat different story – they outline eleven instances that occurred over the course of nine months. Most of those relate to Ms. Colavita yelling at Ms. Sessoms about work deficiencies. The February 2014 entry details how Ms. Colavita followed her to the lunch room "numerous" times. Two of the instances detailed in Ms. Sessoms's notes cannot be characterized as harassment at all (at least of her) – one discusses how Ms. Colavita noted to Ms. Sessoms and her co-worker that she smelled something unpleasant, and the other details an incident during which Ms. Colavita yelled at Ms. Sessoms's non-disabled, non-African-American, male co-worker. To supplement these incidents of harassment, Ms. Sessoms also testified at her deposition that Ms. Alford never said good morning to her, although she said good morning to everyone else, and that Ms. Colavita overlooked her in meetings and was unsympathetic about her mother's passing. She also testified at her deposition that a white coworker was given more opportunities to take on new projects, but she does not describe how often this happened or what kind of projects were offered to others. She testified that she was asked to report to work at 7:00 a.m., even though she was already the first employee to arrive at work at 7:30 a.m.

First, although it is clear that Ms. Colavita's treatment of Ms. Sessoms was upsetting to her, from an objective viewpoint Ms. Sessoms has not presented evidence of treatment so severe as to alter the conditions or terms of her employment. *See Brooks v. CBS Radio, Inc.*, 342 F. App'x. 771, 776 (3d Cir. 2009) ("[I]t is not sufficient for [a plaintiff] to have subjectively perceived the harassment as severe or pervasive; the conduct in question must also be so severe or pervasive that it creates an objectively hostile work environment.") Moreover, aside from her

13

notes outlining a handful of incidents over a nine-month span, Ms. Sessoms presents only her own testimony, in which she fails to provide sufficient detail to allow the Court to make any reliable determination as to the pervasiveness of Penn's conduct.

Even if the conduct Ms. Sessoms complains of were sufficiently severe or pervasive, Ms. Sessoms provides almost no evidence from which a finder of fact could infer that the treatment had anything to do with her race, disability, or allegedly protected conduct. While it is true that facially neutral harassment may serve as evidence of a hostile work environment, *see Cardenas v. Massey*, 269 F.3d 251, 261-62 (3d Cir. 2001) ("[T]he advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim."), a plaintiff must still present some evidence connecting that harassment to her protected status. Ms. Sessoms relies heavily on the fact that she was the only African-American, disabled employee in the department. However, "[s]imply being the lone member of an identifiable racial or [other] minority within [a work department], without more, does not demonstrate racial animus." *Chavez v. New Mexico*, 397 F.3d 826, 834-35 (10th Cir. 2005). At best, Ms. Sessoms argues that she was treated badly, and that she did not observe her co-workers, who did not belong to her protected classes, being treated in the same way. However, even her own contemporaneous notes undermine this assertion, in that her non-black, non-disabled, male co-worker was also publicly yelled at by Ms. Colavita on at least one occasion. Without some evidence to show that Ms. Sessoms's race or disability, or even her complaints of poor treatment, had anything to do with those the way she was treated, Ms. Sessoms's hostile work environment claims must fail.[4]

---

[4] To the extent that Ms. Sessoms is now attempting to add constructive discharge to her list of claims, such a claim must fail for the same reasons that her hostile work environment claims fail.

14

**CONCLUSION**

For the foregoing reasons, the Court will grant Penn's Motion. An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge